Theodore R. CUMMINGS et al., Plaintiffs,

and

Nancy Aronie et al., Intervenors,

v.

Thomas H. MESKILL, Governor of the State of Connecticut, et al., Defendants,

and

J. Brian Gaffney, Intervenor.

Civ. A. No. 14736.

United States District Court,
D. Connecticut.

March 30, 1972.

Stay Granted June 12, 1972.
See 92 S.Ct. 2441.

---

Robert Satter (Satter, Fleischmann & Sherbacow), and James A. Wade, Hartford, Conn., for plaintiffs.

David B. Beizer, for intervening plaintiffs.

Robert K. Killian, Atty. Gen., State of Connecticut, and Raymond J. Cannon, and Barney Lapp, Asst. Attys. Gen., Hartford, Conn., for defendants.

Francis J. McCarthy, and Harry W. Hultgren, Jr., Hartford, Conn., for intervening defendant.

Before SMITH, Circuit Judge, and BLUMENFELD and ZAMPANO, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

This action challenges the Reapportionment Plan for the Connecticut General Assembly devised by a Board of three members, the last available link in a chain of methods mandated by the Connecticut Constitution for the production of a plan of reapportionment for the 1972 elections. The plaintiffs are U. S. citizens, residents of towns in Connecticut, taxpayers, and registered voters. They claim that the Plan violates the Fourteenth Amendment because the deviations from mathematical equality among the districts are impermissibly large, particularly since they have not been justified on the basis of the pursuit of legitimate state policies. They also claim that residents of certain tracts have been entirely omitted from the Plan and that one assembly district is not contiguous. Intervenors Aronie et al. claim that the methods for appointment of personnel for drawing the Plan as well as the Plan ultimately produced deny unaffiliated voters a voice and are therefore unconstitutional. The defendants are officials of the State of Connecticut responsible for enforcing its laws, particularly the Secretary of the State, who is responsible for the conduct of elections. J. Brian Gaffney, intervening as an individual elector of New Britain, argues that the Plan is constitutional, that in any case this court should abstain pending state court action, and that inadvertent errors of omission and lack of contiguity may be corrected, preferably in a state court action now pending.

The action arises under the Fourteenth Amendment to the Constitution of the United States, the Supremacy Clause, Article VI, Clause 2 of the Constitution, and 42 U.S.C. §§ 1983 and 1988. Jurisdiction is conferred by 28 U.S.C. §§ 1343(3) and 1343(4). Plaintiffs seek a temporary and permanent injunction restraining the officers of the state from holding elections in accordance with the present Plan and for further delineation of the rights of the parties.

A three-judge district court was convened to hear and determine the case pursuant to 28 U.S.C. §§ 2281, 2284.

The Connecticut Constitution, adopted following the successful attack on the former system of apportionment in Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn.), aff'd Franklin v. Butterworth, 378 U.S. 564, 84 S.Ct. 1918, 12 L.Ed.2d 1037 (1964), and 237 F.Supp. 302 (D.Conn.1965), requires that the Senate consist of 30 to 50 members and that each senatorial district be contiguous as to territory. The House must consist of from 125 to 225 members; each district is to be contiguous as to territory and no town can be divided except for the purpose of forming assembly districts wholly within the town. Article Third, §§ 3, 4.[1] The Constitution also requires that the establishment of districts comply with federal constitutional standards. Article Third, § 5.[2]

The Connecticut Constitution of 1965 provides further for decennial reapportionment by the General Assembly by two-thirds vote of each house at the first regular session next after the completion of the United States census provided that if the Assembly fails to act by the first of April, a Commission of eight members designated as provided in the Constitution should submit a plan to the Secretary of the State by the first of July and failing timely action by the Commission, a Board of three persons consisting of two Superior Court judges chosen respectively by the Speaker of the House and the Minority Leader of the House and a third member, an elector, selected by the two members so desig-nated is required to submit a plan of districting to the Secretary of the State by October first. When the Assembly and the Commission failed timely to submit a plan, pursuant to this provision Superior Court Judges George A. Saden and Leo Parskey were chosen and in turn selected Justice John R. Thim as the third member of the Board. A plan was approved and adopted by two members of the Board, Judge Saden and Justice Thim, and submitted on September 30, 1971 to the Secretary of the State. The third member of the Board, Judge Parskey, did not approve of the Plan and submitted a minority report. The Plan reapportions the General Assembly of the State of Connecticut.

The population of the State of Connecticut, according to the 1970 census, is 3,032,217.

The Plan provides for a House of Representatives consisting of 151 members, each elected from a single assembly district. With a population of 3,032,217 and 151 assembly districts, the perfect number of people in each assembly district should be 20,081.

The Plan provides for a Senate consisting of 36 senators, each elected from a single senatorial district. With a population of 3,032,217 and 36 senatorial districts, the perfect number of people in each senatorial district should be 84,228.

The population of assembly districts created by the Plan deviates from the perfect average of 20,081 by a maximum

1. Connecticut Constitution of 1965
 *Article Third*
 § 3. Senate, number, qualifications; senatorial districts
 Sec. 3. The senate shall consist of not less than thirty and not more than fifty members, each of whom shall be an elector residing in the senatorial district from which he is elected. Each senatorial district shall be contiguous as to territory and shall elect no more than one senator.
 § 4. House of representatives, composition; assembly districts
 Sec. 4. The house of representatives shall consist of not less than one hundred twenty-five and not more than two hundred twenty-five members, each of whom shall be an elector residing in the assembly district from which he is elected. Each assembly district shall be contiguous as to territory and shall elect no more than one representative. For the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town.

2. Connecticut Constitution of 1965
 *Article Third*
 § 5. Consistency of districts with federal standards
 Sec. 5. The establishment of districts in the general assembly shall be consistent with federal constitutional standards.

of plus 3.93% or 789 people, and by a minimum of 3.90% or 784 people for a total deviation of 7.83%.

In 39 assembly districts under the Plan or 25.83% of the 151 assembly districts, the population deviates from the perfect average of 20,081 by plus or minus 3.0% to 3.93%. The population of 34 assembly districts, 22.52% of the total, deviates by plus or minus 2.0% to 2.99%; the population of 47 assembly districts, 31.12% of the total, deviates from 1.0% to 1.99%; and the population of the remaining 31 assembly districts of the total of 151 assembly districts, 20.53% of the total, deviates from 0.0% to 0.99%.

The average deviation from perfect equality for all the assembly districts under the Plan is 399 people or 1.9% and a mean deviation from perfect equality for all the assembly districts is 373 people or 1.8%.

The ratio of the largest assembly district to the smallest assembly district under the Plan is 1.082 to 1.

The population of senatorial districts created by the Plan deviates from the perfect average of 84,228 by a maximum of plus 0.88% or 745 people and by a minimum of minus 0.93% or 787 people for a total deviation of 1.81%. The average deviation from perfect equality for all the senatorial districts is 379 people or .45% and a mean deviation from perfect equality for all the senatorial districts is 392 people or .47%.

The ratio of the largest senatorial district to the smallest senatorial district under the Plan is 1.018 to 1.

The smallest number of people needed to elect a majority in the House of Representatives (sometimes known as the electoral percentage) is 49.33%.

The smallest number of people needed to elect a majority in the Senate (the electoral percentage) is 52.54%.

The boundary lines of 47 towns are cut under the Plan so that one or more portions of each of these 47 towns are added to another town or a portion of another town to form an assembly district.

Twenty-nine of the aforesaid 47 towns have their boundary lines cut more than once resulting in more than one portion of the town being added to another town or a portion of another town to form an assembly district. If a segment of a town is defined as a portion of a town being used to form an assembly district not wholly within that town, the Plan creates 78 segments of towns in the formation of 151 assembly districts.

The formation of 55 of the 151 assembly districts involved the segmenting of towns and 96 assembly districts are wholly within town boundaries or are formed by the combination of entire towns.

Twenty-three towns are segmented to create senatorial districts under the Plan.

The boundary lines of assembly districts do not mesh with the boundary lines of senatorial districts. Eighty-one assembly districts under the Plan are not located entirely within a senatorial district and in 48 of these 81 assembly districts, a division between two senatorial districts occurs within a town.

The smallest units of census data available to the Reapportionment Board were block groups within census tracts and enumeration districts. The average population of block groups is between 1200 and 1250 people. The average population of enumeration districts is between 750 and 800 people. There is a total of approximately 2750 block groups and enumeration districts; of these about 80% are block groups and about 20% are enumeration districts. Of these approximately 2750 census areas the Board had to work with, the average area contained approximately 1100 people, and the mean area contained approximately 1000 people; 88% of this total of 2750 areas exceeded 400 people in size.

Annexed hereto is a breakdown of the population of senatorial and assembly

districts prepared by the United States Department of Commerce, Bureau of the Census, from the results of the census as of April 1, 1970.[3]

3.

**U.S. DEPARTMENT OF COMMERCE**
Social and Economic Statistics Administration
BUREAU OF THE CENSUS
Washington, D.C. 20233

OFFICE OF THE DIRECTOR

Population of Senate Districts Derived From the Board Plan
of Districting of the General Assembly of the State of Connecticut
Submitted to the Secretary of State of Connecticut on September 30, 1971

| Senate District Number | Population of District According to Official United States Census Results as of April 1, 1970 |
|---|---|
| 1 | 84,273 |
| 2 | 84,973 |
| 3 | 84,459 |
| 4 | 83,580 |
| 5 | 84,547 |
| 6 | 83,441 |
| 7 | 84,708 |
| 8 | 84,749 |
| 9 | 83,787 |
| 10 | 84,828 |
| 11 | 84,779 |
| 12 | 83,458 |
| 13 | 83,612 |
| 14 | 83,822 |
| 15 | 83,838 |
| 16 | 84,631 |
| 17 | 84,299 |
| 18 | 83,996 |
| 19 | 84,622 |
| 20 | 83,903 |
| 21 | 83,581 |
| 22 | 84,209 |
| 23 | 84,484 |
| 24 | 84,247 |
| 25 | 84,543 |
| 26 | 84,376 |
| 27 | 83,990 |
| 28 | 83,678 |
| 29 | 84,541 |
| 30 | 84,878 |
| 31 | 83,801 |
| 32 | 84,166 |
| 33 | 83,999 |
| 34 | 84,864 |
| 35 | 83,992 |
| 36 | 84,563 |

[A5722]

**U.S. DEPARTMENT OF COMMERCE**
Social and Economic Statistics Administration
BUREAU OF THE CENSUS
Washington, D.C. 20233

OFFICE OF THE DIRECTOR

Population of Assembly Districts Derived From the Board Plan
of Districting of the General Assembly of the State of Connecticut
Submitted to the Secretary of State of Connecticut on September 30, 1971

| Assembly District Number | Population of District According to Official United States Census Results as of April 1, 1970 |
|---|---|
| 1 | 19,337 |
| 2 | 19,840 |
| 3 | 19,814 |
| 4 | 19,521 |
| 5 | 19,455 |
| 6 | 19,402 |
| 7 | 20,469 |
| 8 | 20,179 |
| 9 | 20,674 |
| 10 | 20,101 |
| 11 | 20,571 |
| 12 | 20,067 |
| 13 | 19,302 |
| 14 | 20,415 |
| 15 | 20,753 |
| 16 | 19,448 |
| 17 | 19,842 |
| 18 | 20,418 |
| 19 | 20,841 |
| 20 | 20,767 |
| 21 | 20,395 |
| 22 | 19,934 |
| 23 | 19,472 |
| 24 | 20,216 |
| 25 | 20,016 |
| 26 | 20,536 |
| 27 | 19,686 |
| 28 | 19,504 |
| 29 | 19,297 |
| 30 | 19,464 |
| 31 | 20,651 |
| 32 | 20,455 |
| 33 | 20,870 |
| 34 | 20,843 |
| 35 | 20,818 |
| 36 | 19,592 |

[A5723]

| Assembly District Number | Population of District According to Official United States Census Results as of April 1, 1970 |
|---|---|
| 37 | 19,638 |
| 38 | 20,136 |
| 39 | 20,556 |
| 40 | 20,769 |
| 41 | 20,166 |
| 42 | 20,311 |
| 43 | 19,688 |
| 44 | 20,227 |
| 45 | 20,359 |
| 46 | 20,837 |
| 47 | 20,815 |
| 48 | 19,479 |
| 49 | 20,648 |
| 50 | 20,403 |
| 51 | 20,378 |
| 52 | 20,327 |
| 53 | 19,752 |
| 54 | 19,994 |
| 55 | 19,760 |
| 56 | 19,551 |
| 57 | 19,871 |
| 58 | 20,167 |
| 59 | 20,553 |
| 60 | 20,549 |
| 61 | 20,726 |
| 62 | 20,071 |
| 63 | 20,817 |
| 64 | 19,971 |
| 65 | 20,748 |
| 66 | 19,559 |
| 67 | 20,237 |
| 68 | 19,825 |
| 69 | 19,971 |
| 70 | 20,016 |
| 71 | 20,704 |
| 72 | 19,709 |
| 73 | 19,736 |
| 74 | 20,394 |
| 75 | 20,435 |
| 76 | 20,394 |
| 77 | 20,360 |
| 78 | 19,554 |
| 79 | 20,426 |
| 80 | 20,435 |
| 81 | 20,536 |

[A5724]

| Assembly District Number | Population of District According to Official United States Census Results as of April 1, 1970 |
|---|---|
| 82 | 20,856 |
| 83 | 20,057 |
| 84 | 20,524 |
| 85 | 20,297 |
| 86 | 20,717 |
| 87 | 19,842 |
| 88 | 20,606 |
| 89 | 20,375 |
| 90 | 20,181 |
| 91 | 19,998 |
| 92 | 19,798 |
| 93 | 20,636 |
| 94 | 20,555 |
| 95 | 20,138 |
| 96 | 20,530 |
| 97 | 20,271 |
| 98 | 20,549 |
| 99 | 20,350 |
| 100 | 20,654 |
| 101 | 20,035 |
| 102 | 20,444 |
| 103 | 20,806 |
| 104 | 20,626 |
| 105 | 20,802 |
| 106 | 20,281 |
| 107 | 20,633 |
| 108 | 19,919 |
| 109 | 19,609 |
| 110 | 19,703 |
| 111 | 20,439 |
| 112 | 19,413 |
| 113 | 19,799 |
| 114 | 19,406 |
| 115 | 19,466 |
| 116 | 19,504 |
| 117 | 19,805 |
| 118 | 19,487 |
| 119 | 19,565 |
| 120 | 20,013 |
| 121 | 19,525 |
| 122 | 19,536 |
| 123 | 19,300 |
| 124 | 19,330 |
| 125 | 19,317 |
| 126 | 19,831 |
| 127 | 19,960 |
| 128 | 19,359 |

[A5725]

| Assembly District Number | Population of District According to Official United States Census Results as of April 1, 1970 |
|---|---|
| 129 | 19,375 |
| 130 | 19,586 |
| 131 | 19,784 |
| 132 | 19,671 |
| 133 | 19,725 |
| 134 | 19,886 |
| 135 | 20,283 |
| 136 | 19,433 |
| 137 | 19,463 |
| 138 | 20,063 |
| 139 | 19,570 |
| 140 | 20,017 |
| 141 | 20,411 |
| 142 | 20,094 |
| 143 | 19,439 |
| 144 | 19,725 |
| 145 | 20,030 |
| 146 | 20,005 |
| 147 | 20,217 |
| 148 | 20,315 |
| 149 | 20,135 |
| 150 | 19,812 |
| 151 | 19,808 |

*for* GEORGE H. BROWN
Director
Bureau of the Census

[A5726]

In developing the Plan, Mr. Collins, acting for the Board under the direction of Judge Saden, gave principal weight to two considerations in Senate and House districting, numerical equality and a partisan balancing of strength in each house, and in the House districting also the undesirability of splitting towns.

The partisan balancing of strength in each house, termed by intervening defendant a "fair political balance" and by plaintiffs "political gerrymandering" was obtained by so adjusting the census areas utilized as building blocks into the structuring of Senate and House districts that, on the basis of the vote for all the Senate candidates of each party in the elections of 1966, 1968 and 1970, whichever party carried the state should carry a majority of Senate seats proportional to the statewide party majority, and likewise in the House, based on the party vote for all the House candidates of each party in the same three elections.

In one or more House and one or more Senate districts some accommodation was also made in the interest of retaining in office a particular incumbent.

The result apparently obtained by Mr. Collins made up a House of approximately 70 safe Democratic seats, 55 to 60 safe Republican seats, with the balance designed as probable Democratic, swing Democratic, probable Republican, swing Republican, or just plain swing.

The Senate result was characterized as 16 solid Democratic, 2 probable Democratic, 12 solid Republican, 4 probable Republican and 2 swing.

The method used resulted in creating some districts with highly irregular and bizarre outlines. While there is no pro-

vision in the Federal or Connecticut Constitutions requiring that legislative districts be compact, the courts have looked to a lack of compactness, see Paulson v. Meier, 246 F.Supp. 36, 43 (D.N.D.1965) or have required absence of arbitrariness, Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964) in determining whether impermissible purposes rather than compelling state interests have caused deviations from equality; and see Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) ("uncouth twenty-eight-sided figure" in racial gerrymander.) Here the peculiar shapes are additional support for the admitted part the political balance theory played in the structuring of the districts. See also, Drum v. Seawell, 250 F.Supp. 922 (M.D.N.C.1966) "compactness and contiguity are aspects of practicable equality." If partisan political balancing were eliminated as a factor, a closer approach to perfect equality could be achieved with the materials at hand (see Plaintiffs' Exhibit 23, attached as Appendix A), or in the alternative fewer town lines could be cut. (See Plaintiffs' Exhibits 20, 21 and 22, Appendices B, C, and D.)

We find that the court has jurisdiction over the parties and subject matter of the action.

■ We conclude that the deviations from equality of populations of the Senate and House districts are not justified by any sufficient state interest and that the Plan denies equal protection of the law to voters in the districts of greater population in violation of the Fourteenth Amendment to the Constitution of the United States. The Plan is therefore invalid and its employment in elections to the Connecticut General Assembly must be enjoined.

Intervening defendant urges that we abstain from action in this case pending resolution of an action in the state courts. We note in this connection that the Attorney General of Connecticut has questioned the jurisdiction of the state courts over the action of the Board as a constitutional body. We do not share his concern over the power of the state courts to act, but find the abstention doctrine inapplicable to this case.

■ The abstention doctrine of Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944) and its progeny would encourage abstention by the federal courts pending resolution by the state courts of ambiguities in state legislation whose resolution might eliminate the federal constitutional question entirely. Here, however, the interpretation of the state constitutional provisions by the state court will not eliminate the question of whether the Board's Plan either as written or as modified in the respects sought in the state court action complies with the so-called "one-man-one-vote" requirement of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and the cases which have followed, see Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); and especially the more recent cases of Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964), an apportionment case, holds that "where the federal court's jurisdiction is properly invoked and the relevant state constitutional and statutory provisions are plain and unambiguous there is no necessity for the federal court to abstain pending determination of the state law questions in a state court," citing McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). See also, Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); Sostre v. McGinnis, 442

F.2d 178 (2d Cir. 1971) (en banc), cert. denied, Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); Rodriguez and companion cases v. McGinnis, 456 F.2d 79 (2d Cir. 1972) (en banc); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (Dec. 14, 1971). So we reach the merits.

 The constitutional principle of the vote cases appears to be that deviations from absolute numerical equality which are more than minimal may not be allowed unless they are either the unavoidable results of attempts to obtain precise equality or are justified by some legitimate state interest. While the early cases seem to indicate that political subdivision boundaries and geographical and historical· factors could justify some deviations from equality, dilution would not be allowed "in any substantial way." See Reynolds v. Sims, *supra.* Applying this standard there have been very few bases for deviation approved. As Justice Fortas remarked, concurring in *Kirkpatrick,* "the Court rejects almost every justification that would support any variation." Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) did permit deviation for a legitimate state interest based on the unusual historical interrelationship of local and county governmental bodies in New York carrying out dual functions with dual personnel. We have no such situation here. The defendants seek to justify the deviations here as the product of a good faith effort to reach equality while honoring the state constitutional requirement of keeping to town boundaries and at the same time balancing the results for partisan political fairness, that is, to achieve an apparent balance of partisan political strength in the Assembly coinciding with the total statewide partisan political balance measured by the results in the last three Assembly elections. Plaintiffs attack this as political gerrymandering and base their case primarily on the claim that this is in itself constitutional-

ly prohibited. Defendants contend that it is not only not prohibited but not justiciable as a political question. It is quite possible that if the sole question were political gerrymandering it would be non-justiciable. See Sincock v. Gately, 262 F.Supp. 739 (D.Del.1967); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); WMCA Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y. aff'd per curiam, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1965), with a concurring opinion in which Mr. Justice Harlan interpreted the decision to mean that the Supreme Court must be held to have found partisan gerrymandering immune to constitutional attack, and the *per curiam* opinion of the Supreme Court, Badgley v. Hare, 385 U.S. 114, 87 S.Ct. 338, 17 L.Ed.2d 207 (1966) on appeal from the Supreme Court of Michigan, 377 Mich. 396, 140 N.W.2d 436, In the Matter of the Apportionment of the Michigan Legislature, Badgley, et al., Appellants, dismissing the appeal, stating "the motions to dismiss are granted and the appeal is dismissed for want of a substantial federal question." See also, Cousins v. City Council of Chicago, 322 F.Supp. 428 (N.D.Ill.1971) and Skolnick v. Mayor & City Council of Chicago, 319 F.Supp. 1219 at 1229 (N.D.Ill.1970). Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971) and Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) also seem to indicate that claims based purely on political gerrymandering would be extremely difficult to sustain if justiciable at all. But we need not reach this question. From the other side there is no doubt that *political gerrymandering cannot be approved as a legitimate reason for violating the requirement of numerical equality of population in districting.* While it may be fair in one sense in obtaining an overall political balance, it is arguably unfair to individual voters and potential candidates for political office who find themselves locked into districts deliberately structured to be

"safe" districts for a party they oppose.[4] No legislative or constitutional enactment provides any basis for it or authorizes it. No compelling state necessity for it is demonstrated. The Supreme Court plainly would not approve the partisan political structuring which was a substantial cause of the numerical deviations of the Board Plan here. In Ely v. Klahr, *supra*, the Court approved of the invalidation of a legislative plan by the lower court, which had found "inapposite" "the consideration of party strength as a factor in reapportionment or redistricting" as well as a purpose to minimize contests between incumbents. We must therefore invalidate the Plan before us and require closer adherence to the constitutional guidelines.

■ The effort by the intervening plaintiffs to create a new constitutional requirement of inclusion of a class of registered voters unaffiliated with any party in setting up districting boards or commissions need not give us pause. There is no precedential basis for the claim. What little precedent we have found looks the other way. See Socialist Workers Party v. Rockefeller, 314 F. Supp. 984, 997 (S.D.N.Y.), aff'd 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970). (Major party chairmen permitted to take part in selecting members of Board of Elections.) The area is sufficiently confused as it is without attempting further to shackle constitutionally the legislative bodies seeking to act in the field. The unaffiliated voter takes part on an equal basis in the election of the Assembly, from whose members participants in the appointment of the Commission and Board are chosen.

We do not reach the pendent claim of non-compliance with the state constitution or the matter of correcting the inadvertent errors in view of the fact that we are adopting another apportionment in any case.

It would be preferable to a court-imposed plan, of course, if a valid plan were adopted by the legislature in place of the Plan of the Board here invalidated. We would welcome such action. However, the time is short and delay in the hope of such legislative action is not justified.

■ We hold that the state constitutional scheme for decennial redistricting of the Connecticut General Assembly is not itself invalid as in violation of the Fourteenth Amendment of the Constitution of the United States. We hold, however, that the Plan adopted by the Board under the constitutional scheme denies the equal protection of the law to plaintiffs whose voting power is diluted by the deviation from numerical equality of the Senate and Assembly districts set up by the Plan. Defendants are enjoined from any action to implement the Plan or to hold elections thereunder. The court will appoint a master with instructions to devise a plan conforming to federal and state constitutional requirements, to be submitted to the court and placed in effect.

The foregoing shall be considered the findings of fact and conclusions of law of the court under Federal Rule of Civil Procedure 52(a).

If a constitutional plan is enacted into law prior to a court order placing a court plan in effect application may be made to modify the court's judgment. The court will retain jurisdiction for all purposes.

---

4. For a discussion of the problems of judicial consideration of political gerrymandering, see O'Rourke, "Reapportionment: Law, Politics and Computers," Domestic Affairs Study 1, 1972 pp. 38–39 and 44–48.