NEW DEMOCRATIC COALITION v SECRETARY OF STATE

1. CONSTITUTIONAL LAW—EQUAL PROTECTION—LEGISLATIVE DISTRICTS —EQUALITY.

The extent to which equality of population in districts from which legislators are elected may practicably be achieved may differ from state to state and district to district; what is required is that the state make a good-faith effort to achieve precise mathematical equality (US Const, Am XIV).

2. CONSTITUTIONAL LAW—EQUAL PROTECTION—LEGISLATIVE DISTRICTS —EQUALITY—GOOD FAITH.

The Court of Appeals will not hold that a legislative apportionment plan for state senate districts fails to meet the requirement of a good-faith effort to achieve precise mathematical equality where the plan has thrice survived review by the Michigan Supreme Court and where the deviations from equality are much smaller than those in a plan which has been held not to be a good-faith effort (US Const, Am XIV).

3. CONSTITUTIONAL LAW—EQUAL PROTECTION—ELECTIONS—STATE SENATORS—NEW DISTRICTS.

The equal protection clause of the Fourteenth Amendment does not require that state senators, elected under an apportionment plan that met current constitutional standards when they were elected, stand for re-election at the first primary and general elections following a Federal decennial census which results in new districts where the terms of the incumbent senators would be shortened by two years by such an election (US Const, Am XIV).

4. CONSTITUTIONAL LAW—EQUAL PROTECTION—ELECTIONS—STATE SENATORS.

A two-year delay following the Federal decennial census every 20

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 16 Am Jur 2d, Constitutional Law § 504.
[3, 4] 16 Am Jur 2d, Constitutional Law §§ 485, 493.
  25 Am Jur 2d, Elections § 15.
[5, 7] 25 Am Jur 2d, Elections §§ 3, 15.
[6] 25 Am Jur 2d, Elections §§ 104, 106.

years in the election of state senators because the state constitution provides for four-year terms for senators is not unconstitutional; to hold otherwise would result in no legislative term of office being certain since a special census might be taken at any time.

5. ELECTIONS—STATE SENATORS—VACANCIES—SPECIAL ELECTION.

Any vacancy occurring in the office of an incumbent state senator during the remainder of his term may be filled by a special election in the district from which he was elected; the special election would not have to be conducted under a new apportionment plan adopted after a new decennial census.

6. ELECTIONS—CONSTITUTIONAL LAW—VOTER QUALIFICATIONS—STATE SENATORS—NEW ELECTION.

The Twenty-Sixth Amendment to the Federal constitution which qualifies 18-year-old or older persons to vote at elections held after July 5, 1971 does not require a new election of incumbent state senators mid-way in their terms of office to which they were elected before that date (US Const, Am XXVI).

7. ELECTIONS—NEW ELECTION—LACHES—JUDICIAL NOTICE.

Judicial notice is taken that elections require the existence of a reasonable amount of time for election officials to comply with the mechanics and complexities of state election laws, and plaintiffs' request for a writ of mandamus to compel new election of state senators in 1972 may be denied where to grant the relief requested would seriously strain the election machinery and endanger the election process because of the short time between the request for relief and the election.

Original action in the Court of Appeals. Submitted Division 2 June 9, 1972, at Detroit. (Docket No. 14262.) Decided June 19, 1972. Leave to appeal denied, 387 Mich 800.

Complaint for mandamus by the New Democratic Coalition against Richard H. Austin, Secretary of State, to call an election of all state senators in the 1972 primary and general elections and to declare that Const 1963, art 4, § 2, and all statutes tied to it are unconstitutional insofar as they conflict with the requested order. The Michi-

gan State Senate and individual state senators intervened as defendants. Complaint dismissed.

*Koster & Bullard,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Russell A. Searl,* Assistant Attorney General, for the Secretary of State.

*Foster, Lindemer, Swift & Collins,* and *Tom Downs,* for intervenor defendants.

Before: LESINSKI, C. J. and J. H. GILLIS and V. J. BRENNAN, JJ.

PER CURIAM. Plaintiffs have urged this Court to order that all state senators stand for election in the primary and general elections of 1972, and to declare that Const 1963, art 4, § 2 and the statutes tied to it are unconstitutional insofar as they conflict with that order. Plaintiffs further urged this Court to order that those primary and general elections be carried out in the new state senate districts declared in effect by the Michigan Supreme Court on May 4, 1972.

Plaintiffs' first argument was that the incumbent state senators were elected from 1964 apportionment districts which were not sufficiently close to equal in population to comply with current equal protection standards. While conceding during oral argument that the Austin-Kleiner plan implemented in 1964 using 1960 census data satisfied the standards of *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), plaintiffs' counsel continued to maintain that the districts established in 1964 did not satisfy the "precise mathematical equality" standard of *Kirkpatrick v*

*Preisler,* 394 US 526; 89 S Ct 1225; 22 L Ed 2d 519 (1969), because there was a population disparity of 0.58% over the ideal district in population and a population disparity of 0.40% under the ideal district in population.

Counsel for the defendant Secretary of State correctly points out that the *Kirkpatrick* case involved congressional districting and the United States Supreme Court has not yet held that the "precise mathematical equality" standard applies to state legislative apportionment plans. *Connor v Williams,* 404 US 549; 92 S Ct 656; 30 L Ed 2d 704 (1972).

Further, despite plaintiffs' argument that the Austin-Kleiner plan was never approved by the Michigan Supreme Court, its adoption was ordered by that Court in 1964, *In re Apportionment of State Legislature—1964,* 373 Mich 250 (1964). It was before the Michigan Supreme Court for review again in each of the next two years, and remained in effect. *In re Apportionment of State Legislature — 1965,* 376 Mich 410 (1965) and *In re Apportionment of State Legislature — 1965–66,* 377 Mich 396 (1966).

Persuasive on this initial issue is the comparison in the defendant's brief of the deviations from an ideal district in the *Kirkpatrick* case, *supra,* and in the Michigan Senate under the Austin-Kleiner plan. The ratio of largest to smallest resulted in 1.06 in *Kirkpatrick* and 1.03 under the Austin-Kleiner senate plan. The deviation of the largest district from the ideal was 3.13% in *Kirkpatrick* but only 0.58% under the Austin-Kleiner senate plan. The deviation of the smallest district from the ideal was 2.84% in *Kirkpatrick* but only 0.40% under the Austin-Kleiner senate plan. The average deviation from the ideal district was 1.6% in *Kir-*

*patrick* but only 0.208% under the Austin-Kleiner senate plan. Under the Austin-Kleiner senate plan the minimum percentage of the state's population capable of electing a majority of the senate was 52.5%. Regarding these last two tests, defendant asserted in his brief that Michigan's senate plan led the nation.

Plaintiffs did not dispute the comparison in the defendant's brief of the deviations from an ideal district in the *Kirkpatrick* case and the Michigan Senate under the Austin-Kleiner plan, nor did plaintiffs dispute that Michigan's senate plan led the nation regarding the average deviation from the ideal district and the percentage of the state's population capable of electing a majority to the senate.

Rather plaintiffs argued that even the small deviations existing under the Austin-Kleiner senate plan could not be sustained under the "precise mathematical equality" standard of *Kirkpatrick* although in fact the deviations under the Austin-Kleiner senate plan were less than those in the *Kirkpatrick* case in every category of the comparison.

The Supreme Court said in *Kirkpatrick*, "The extent to which equality may practicably be achieved may differ from State to State and from district to district. Since 'equal representation for equal numbers of people [is] the fundamental goal for the House of Representatives,' *Wesberry v Sanders, supra,* [376 US 1, 18; 84 S Ct 526, 535; 11 L Ed 2d 481, 492 (1964)], the 'as nearly as practicable' standard requires that the State *make a good-faith effort to achieve precise mathematical equality.* See *Reynolds v Sims,* 377 US 533, 577; 84 S Ct 1362, 1390; 12 L Ed 2d 506, 536 (1964)." (Emphasis added.)

It is elementary that this Court has no power to reverse the Michigan Supreme Court. Therefore, since the Austin-Kleiner plan has thrice survived review in the Michigan Supreme Court and the senate districts apportioned under it are closer to precise mathematical equality than those in the *Kirkpatrick* case, *supra,* we are not disposed to hold that the Austin-Kleiner plan fails to meet the good-faith effort to achieve precise mathematical equality required by the United States Supreme Court in the *Kirkpatrick* case.

Plaintiffs' main argument is that because of large population shifts since the 1960 census incumbent state senators represent districts which are severely malapportioned according to the 1970 census, and this malapportionment denies equal protection to voters in under-represented areas. Plaintiffs argue that equal protection requires that state senators be elected at the November, 1972, general election from the new districts apportioned pursuant to the Hatcher-Kleiner plan which was based on the 1970 census.

On May 4, 1972, the Michigan Supreme Court ordered the adoption of the Hatcher-Kleiner plan and said that it should be placed in effect for the primary and general elections of 1972. The Supreme Court further stated that nominating petitions could be filed or filing fees paid for the office of state representative at any time after the date of the order up to 4 p.m. on June 20, 1972. No mention was made of the office of state senate, presumably because state senators were elected in 1970 for a four-year term commencing January 1, 1971, pursuant to Const 1963, art 4, § 2.

The main issue may be stated: Does the Fourteenth Amendment require that state senators elected under an apportionment plan that meets

current constitutional standards stand for re-election at the first primary and general elections following the federal decennial census where to do so would require shortening the terms of the incumbent senators by two years?

Counsel for the parties have admittedly found no case squarely in point. The principal cases cited by the parties will be discussed briefly. Plaintiffs have relied heavily on *Skolnick v Illinois State Electoral Board,* 307 F Supp 691 (ND Ill, 1969). In that case the court held that the *next* term of the senators would be only for two years, rather than four, but it did not shorten the terms of the incumbent senators. Significantly, the apportionment plan under which the senators had previously been elected was unconstitutional and the court was simply limiting the use of that unconstitutional plan to the time when a new plan based on the 1970 census would have been adopted.

Plaintiffs also relied on *Mann v Davis,* 238 F Supp 458 (ED Va, 1964), *aff'd* 379 US 694; 85 S Ct 713; 13 L Ed 2d 698 (1965); *Swann v Adams,* 385 US 440; 87 S Ct 569; 17 L Ed 2d 501 (1967); *Kilgarlin v Hill,* 386 US 120; 87 S Ct 820; 17 L Ed 2d 771 (1967); and *Whitcomb v Chavis,* 403 US 124; 91 S Ct 1858; 29 L Ed 2d 363 (1971). In *Mann v Davis* both houses of the General Assembly had been elected under an invalid apportionment plan. The elections took place during a temporary stay of enforcement of a finding that the plan was unconstitutional. Delegates were elected for two-year terms and senators for four-year terms. A Virginia district court held that the incumbent senators would have to stand for re-election no later than the same time as the delegates since there was no basis for permitting the senators to serve the full four-year terms when they had been

"elected on a void pattern of representation". The Supreme Court affirmed in a memorandum decision.

In *Swann v Adams* the Supreme Court reversed a decision by the district court upholding a legislative reapportionment plan under which population variances ranged from 15.09% overrepresented to 10.56% underrepresented in the senate and from 18.28% overrepresented to 15.27% underrepresented in the house, where there was no evidence or even argument by the state or the district court explaining the challenged variations. That is clearly not the fact situation before this Court.

In *Kilgarlin v Hill* the Supreme Court held that the district court acted properly in allowing the 1966 election to proceed under a statutory reapportionment plan that was partially unconstitutional, that the plaintiffs had made out a case under the Fourteenth Amendment, and unless the population variances could be justified by the district court or the evidence of record the apportionment plan was invalid. The case was remanded for further proceedings. The plaintiffs' proofs showed population variances which ranged from 14.84% overrepresented to 11.64% underrepresented, the ratio between the largest and the smallest district was 1.31 to 1, the deviation from the average population per representative was greater than 10% in twelve districts and 55 representatives would be elected from eight multi-member districts in which the population per representative varied from the ideal by more than 6%.

In *Whitcomb v Chavis* the Supreme Court held that the district court properly ordered statewide reapportionment where the population variance in the senate ranged from 13.68% overrepresented to 14.52% underrepresented.

The defendants relied on *Maryland Committee for Fair Representation v Tawes,* 377 US 656; 84 S Ct 1429; 12 L Ed 2d 595 (1964) and *Long v Docking,* 283 F Supp 539 (D Kan, 1968). In *Maryland Committee for Fair Representation v Tawes* the Court held that both houses of the Maryland legislature were malapportioned. All members had been elected in 1962 to serve four-year terms. Nevertheless, the United States Supreme Court did not require new elections prior to the next scheduled election of the legislators in 1966. That case is not controlling in this instance, however, since apparently there was no existing constitutional plan of apportionment as in this case.

In *Long v Docking* the court specifically stated that although the state senate had been invalidly elected in 1964 and the court was decreeing a new but temporary apportionment plan for the election of state senators in 1968, the incumbent senators could lawfully hold their offices until the expiration of the terms to which they were elected.

It is obvious that none of the above cases involve incumbent legislators elected under an apportionment plan that meets current constitutional standards. In the absence of any precedent on the main issue before us, we rely on *Reynolds v Sims, supra,* and *Kirkpatrick v Preisler, supra,* as guides for our decision. In *Reynolds v Sims,* Chief Justice Warren writing for a majority of the Court expressed his concern for a citizen's vote being equal to the vote of any other citizen. He wrote, pp 562–563:

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and di-

rectly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or ten times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or ten times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or ten, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. Of course, the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical. Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or ten of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' "

Considering the present case, citizens' votes were equal when they last voted for state senators

in 1970 under the Austin-Kleiner plan and they
will be equal when they next vote for state sena-
tors in 1974 under the Hatcher-Kleiner plan.

Chief Justice Warren also wrote, pp 583–584:

"That the Equal Protection Clause requires that both
houses of a state legislature be apportioned on a popula-
tion basis does not mean that States cannot adopt some
reasonable plan for periodic revision of their apportion-
ment schemes. Decennial reapportionment appears to
be a rational approach to readjustment of legislative
representation in order to take into account population
shifts and growth. Reallocation of legislative seats every
10 years coincides with the prescribed practice in 41 of
the States, often honored more in the breach than the
observance, however. Illustratively, the Alabama Con-
stitution requires decennial reapportionment, yet the
last reapportionment of the Alabama Legislature, when
this suit was brought, was in 1901. Limitations on the
frequency of reapportionment are justified by the need
for stability and continuity in the organization of the
legislative system, although undoubtedly reapportioning
no more frequently than every ten years leads to some
imbalance in the population of districts toward the end
of the decennial period and also to the development of
resistance to change on the part of some incumbent
legislators. In substance, we do not regard the Equal
Protection Clause as requiring daily, monthly, annual
or biennial reapportionment, so long as a State has a
reasonably conceived plan for periodic readjustment of
legislative representation. While we do not intend to
indicate that decennial reapportionment is a constitu-
tional requisite, compliance with such an approach
would clearly meet the minimal requirements for main-
taining a reasonably current scheme of legislative rep-
resentation. And we do not mean to intimate that more
frequent reapportionment would not be constitutionally
permissible or practicably desirable. But if reapportion-
ment were accomplished with less frequency, it would
assuredly be constitutionally suspect."

Considering the present case again, we note that

the main issue raised in this case could not arise again until 1992 under the present constitutional provision of four-year terms coinciding with the governor's. That is because elections for state senators will be held in 1974, 1978, *1982*, 1986, 1990, and *1994*. Thus, the 1982 election will coincide with the first primary and general election held after the 1980 census. A delay following the Federal decennial census of two years every 20 years in the election of state senators because the people of the state of Michigan have adopted a constitution providing for four-year terms for state senators is not in our opinion unconstitutional under the requirements set forth in *Reynolds v Sims*.[1] To hold otherwise would apparently result in no legislative term of office being certain since a special census might be taken at any time.

Nor do we think that *Kirkpatrick v Preisler, supra*, requires a different result. In addition to what has already been said about that case earlier in this opinion, we note further that the district court had found that the apportionment plan had not been based on census figures but instead on less accurate data. Additionally, a redistricting plan which provided for districts with smaller population variances among them had been rejected by the general assembly. Finally, the district court found that the simple device of switching some counties from one district to another would have produced a plan with markedly reduced variances among the districts. Faced with those facts, the United States Supreme Court affirmed the district court's holding that the plan did not meet the constitutional standard of equal representation for equal numbers of people "as

---

[1] The Michigan Constitution could be amended so that this factual situation would not arise again.

nearly as practicable", and that the state had failed to make any acceptable justification for the variances. Of additional significance for this case is the fact that the United States Supreme Court stayed the district court's judgment pending appeal and expressly authorized the state to conduct 1968 congressional elections under and pursuant to the unconstitutional apportionment plan.

It is our opinion that the equal protection clause of the Fourteenth Amendment does not require that state senators elected under an apportionment plan that meets current constitutional standards stand for re-election at the first primary and general elections following the Federal decennial census where to do so would require shortening the terms of the incumbent senators by two years.

The remaining issues may be more quickly determined. Plaintiffs argue that in the event of a state senate vacancy between now and the 1974 elections the special election to fill the vacancy would have to be conducted under the Hatcher-Kleiner plan. We disagree. Any vacancy occurring in the office of an incumbent senator during the remainder of his term may be filled by a special election in the district from which he was elected.

Lastly, plaintiffs contended that state senate elections must be held this year so that the new young voters enfranchised by the Twenty-Sixth Amendment could vote for state senate candidates this year instead of having to wait two more years. US Const, Am XXVI, § 1 reads:

"Section 1. The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

It is our opinion that the Twenty-Sixth Amend-

ment qualified people in a certain age group to vote at elections held after its effective date, July 5, 1971 — but it does not require a new election of senators mid-way in the terms of office to which the incumbent senators had been elected.

Having decided in the defendant's favor on the issues raised by the plaintiffs, we will spend only a brief time on the intervenor defendants' argument that plaintiffs' suit is barred by laches. The intervenor defendants asserted, *inter alia,* that the 1970 census data was confirmed on November 5, 1971 and that plaintiffs thereafter could have and should have commenced this action because the census data showed that population shifts had occurred and redistricting would be required.

Plaintiffs replied that May 4, 1972 was the earliest date upon which incumbent state representatives were able to know their new districts with certainty and that only 12 days later all incumbent state senators were put on notice by the filing of this action that they might have to run this year in the new districts announced on May 4.

We are not convinced that inconvenience to incumbent senators would be sufficient by itself to override the constitutional right to equal protection of the laws if in fact equal protection had been denied the voters of this state. However, there is merit to the argument that this suit comes so late that if the relief requested were granted the stability and continuity of the election process would be undermined.

We take judicial notice of the fact that elections require the existence of a reasonable amount of time for election officials to comply with the mechanics and complexities of our election laws. The state has a compelling interest in the orderly

process of elections. Courts can reasonably endeavor to avoid unnecessarily precipitate changes that would result in immense administrative difficulties for election officials. *Reynolds v Sims, supra.* In this case to grant the relief requested by the plaintiffs would seriously strain the election machinery and endanger the election process.[2]

For the reasons stated, we order that plaintiffs' complaint for writ of mandamus be dismissed.

[2] Since oral argument in this case the United States Supreme Court on June 12, 1972 stayed the effect of a United States District Court for Connecticut decision *(sub nom Cummings v Meskill,* 341 F Supp 139 [1972]), declaring unconstitutional the 1971 Connecticut reapportionment plan based on 1970 census data, so that the 1972 elections will be held under the 1971 apportionment plan. Although dissenting, Justice Douglas stated:

"There is 'irreparable injury' in a different sense if the court's order striking down a state apportionment is handed down so near the upcoming election that it is administratively impractical to implement an orderly election." *Gaffney v Cummings,* 40 LW 3587.