ELY *v.* KLAHR ET AL.

No. 548.   Argued March 23, 1971—Decided June 7, 1971

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a concurring opinion, in which BLACK, J., joined, *post,* p. 116. HARLAN, J., filed a statement concurring in the result, *post,* p. 123.

*Philip J. Shea* argued the cause and filed a brief for appellant.

*John M. McGowan II,* Special Assistant Attorney General of Arizona, argued the cause for appellees. With him on the brief was *Gary K. Nelson,* Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

This appeal is the latest step in the long and fitful attempt to devise a constitutionally valid reapportionment scheme for the State of Arizona. For the reasons given, we affirm the judgment of the District Court.

In April 1964, shortly before this Court's decision in *Reynolds v. Sims,* 377 U. S. 533 (1964), and in its companion cases, suit was filed in the District Court for the District of Arizona attacking the then-existing state districting laws as unconstitutional.[1] Following those decisions, the three-judge District Court ordered all proceedings stayed "until the expiration of a period of 30 days next following adjournment of the next session" of the Arizona Legislature. (App. 2–3, unreported.) Nearly a year later, on May 18, 1965, after the legislature had failed to act, the court again deferred trial pending a special legislative session called by the Governor to deal with the necessity of reapportionment. The special session enacted Senate Bill 11, which among other things provided one senator for a county of 7,700 and another for a county of 55,000. The session did not undertake to reapportion the House. Trial was had in November 1965 and on February 2, 1966, the court enjoined enforcement of Senate Bill 11, which, it held, "bears evidence of having been thrown together as a result of considerations wholly apart from those laid down as compulsory by the

---

[1] Throughout this litigation, congressional districting has been at issue as well and has suffered the same fate as reapportionment of the legislature. However, appeal has been taken here only with respect to the lower court's decree concerning legislative reapportionment.

decisions of the Supreme Court." *Klahr* v. *Goddard,* 250 F. Supp. 537, 541 (Ariz. 1966). The plan, said the court, was "shot through with invidious discrimination." *Id.,* at 546. The court also held that the existing House plan produced disparities of nearly four to one, which was clearly impermissible under our decisions.

Noting that the legislature "has had ample opportunity" to produce a valid reapportionment plan, the court formulated its own plan as a "temporary and provisional reapportionment," designed to govern the impending preparation for the 1966 elections. The plan was to be in effect "for the 1966 primary and general elections and for such further elections as may follow until such time as the Legislature itself may adopt different and valid plans for districting and reapportionment." [2] *Id.,* at 543. It retained jurisdiction, as it has done since.

Some 16 months later, in June 1967, the Arizona Legislature enacted "Chapter 1, 28th Legislature," which again attempted reapportionment of the State. Within the month, suit was filed charging that this Act also was unconstitutional, but the court deferred action pending the outcome of a referendum [3] scheduled with the November 1968 election for the legislature and Congress. It ordered those elections to be held in accordance with its own 1966 plan, as supplemented. *Klahr* v. *Williams,* 289 F. Supp. 829 (Ariz. 1967). The legislative plan was approved by the voters in the referendum and signed into law by the Governor on January 17, 1969. A hearing on the plan was commenced the same day. The court concluded on July 22, 1969, that the plan, which

---

[2] The court issued two supplemental decrees in 1966 which modified and clarified the original order. 254 F. Supp. 997, 289 F. Supp. 827.

[3] Apparently under Arizona law, a referendum is required before a bill can become law where, as here, sufficient signatures against the bill are filed with the Secretary of State. See *Klahr* v. *Williams,* 289 F. Supp. 829 (Ariz. 1967).

set up "election districts" based on population and "legislative" subdistricts based on voter registration, would allow deviations among the legislative subdistricts of up to 40% from *ideal* until 1971, and up to 16% thereafter. The court properly concluded that this plan was invalid under *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969), and *Wells* v. *Rockefeller,* 394 U. S. 542 (1969), since the legislature had operated on the notion that a 16% deviation was *de minimis* and consequently made no effort to achieve greater equality. The court ordered its 1966 plan continued once again "until the Legislature shall have adopted different, valid, and effective plans for redistricting and reapportionment . . . ." (App. 85, unreported.) It refused to order the 1970 elections to be held at large, since there was "ample time" for the legislature "to meet its obligation" before the machinery for conducting the 1970 elections would be engaged.

The legislature attempted a third time to enact a valid plan. It passed "Chapter 1, House Bill No. 1, 29th Legislature," which was signed into law by the Governor on January 22, 1970, and which is the plan involved in the decision from which this appeal is taken. Appellant challenged the bill, alleging that it "substantially disenfranchises, unreasonably and unnecessarily, a large number of the citizens of the state," App. 106, and "creates legislative districts that are grossly unequal." App. 108. Appellant at that time submitted his own plan for the court's consideration. Appellant's primary dispute with the new plan was that it substantially misconceived the current population distribution in Arizona. The court agreed that appellant's plan, which utilized 1968 projections of 1960 and 1965 Arizona censuses, could "very likely [result in] a valid reapportionment plan" but it declined to implement the plan, since it was based on census tracts, rather than the existing precinct boundaries, and "the necessary reconstruction of the election

precincts could not be accomplished in time" to serve the 1970 election, whose preliminary preparations were to begin in a few weeks. *Klahr* v. *Williams,* 313 F. Supp. 148, 150 (Ariz. 1970). At the same time, the court observed that its 1966 plan had fallen behind contemporary constitutional requirements, due to more recent voter registration data (which increased the deviation between high and low districts to 47.09%) and the intervening decisions of this Court in *Kirkpatrick* and *Wells,* supra, and *Burns* v. *Richardson,* 384 U. S. 73 (1966).

Turning to the legislature's plan, the court found it wanting in several respects. First, though the result indicated population deviation between high and low districts of only 1.8%, the population formula used [4] did not "truly represent the population within [the] precincts in either 1960 or 1968," and thus "the figures produced . . . are not truly population figures." 313 F. Supp., at 152. Second, the computer that devised the plan had been programmed to assure that the plan would not require any incumbent legislator to face any other incumbent for re-election. Third, the programming gave priority to one-party districts over districts drawn without regard to party strength. The court held that "the incumbency factor has no place in any reapportionment or redistricting" [5] and found "inapposite" the

[4] "The population factor in each of the election precincts comprising part of a legislative district was obtained by instructing the computer to take the 1968 voter registration for the precinct and divide it by the 1968 voter registration for the county in which the precinct was located, thereby obtaining the percentage of registered voters of the county residing within the precinct. The computer was then directed to multiply that percentage figure by the 1960 census for the county in which the precinct was located, thereby obtaining the population factor for the precinct." 313 F. Supp., at 151–152.

[5] Though we noted in *Burns* v. *Richardson,* 384 U. S. 73, 89 n. 16, that "[t]he fact that district boundaries may have been

"consideration of party strength as a factor . . . ." *Ibid.*

The court was thus faced with a situation where both its 1966 plan and the legislature's latest attempt fell short of the constitutional standard. At that time, however, the 1970 elections were "close at hand." The court concluded that another legislative effort was "out of the question" due to the time and felt that it could not itself devise a new plan without delaying primary elections, "a course which would involve serious risk of confusion and chaos." *Ibid.* It considered at-large elections, but the prospect of electing 90 legislators at large was deemed so repugnant as to be justified only if the legislature's actions had been "deliberate and inexcusable"; the court instead believed that the large population increase in Arizona since the last reliable census in 1960 was more to blame. Concluding that the 1970 elections would be the last to be held before the 1970 census data became available for new plans, the court chose what it considered the lesser of two evils and ordered the elections to be conducted under the legislature's plan. In its order to this effect, the court noted that it "assumes that the Arizona Legislature will by November 1, 1971, enact a valid plan of reapportionment," but that "[u]pon failure of the Legislature so to do, any party to this action may apply to the court for appropriate relief." *Id.,* at 154.

The state officials did not seek review of the District Court's judgment declaring Chapter 1 unconstitutional. Appellant, however, appealed to this Court. His notice of appeal was filed on June 18, 1970, his jurisdictional statement on August 17, 1970. The latter presented the single question whether it was error for the United States

---

drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness," it is sufficient to note here that the District Court did not base its decision solely on this factor.

District Court to refuse to enjoin the enforcement of the Arizona Legislature's most recent effort to reapportion the State. Appellees' motion to dismiss or affirm was filed on November 24. We noted probable jurisdiction on December 21, 400 U. S. 963.

Meanwhile, the 1970 elections were held in accordance with the District Court's decree. Appellees suggest that the issue presented is moot and appellant concedes "the 1970 general election has already been held so that that aspect of the wrong cannot be remedied." Brief 8. But appellant now argues that however that may be, the District Court should now proceed to adopt a plan of reapportionment which would be displaced only upon the adoption of a valid plan by the legislature. Appellant doubts that postponing judicial action until after November 1 will give the District Court sufficient time, prior to June 1972, when the election process must begin in Arizona, to consider the legislative plan and to prepare its own plan if the legislative effort does not comply with the Constitution. The feared result is that another election under an unconstitutional plan would be held in Arizona.

Reapportionment history in the State lends some substance to these fears, but as we have often noted, districting and apportionment are legislative tasks in the first instance,[6] and the court did not err in giving the legislature a reasonable time to act based on the 1970 census figures which the court thought would be available in the summer of 1971. We agree with appellant that the District Court should make very sure that the 1972 elec-

---

[6] E. g., Reynolds v. Sims, 377 U. S. 533, 586 (1964):

"[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."

tions are held under a constitutionally adequate apportionment plan. But the District Court knows better than we whether the November 1 deadline will afford it ample opportunity to assess the legality of a new apportionment statute if one is forthcoming and to prepare its own plan by June 1, 1972, if the official version proves insufficient. The 1970 census figures, if not now available, will be forthcoming soon; and appellant, if he is so inclined, can begin to assemble the necessary information and witnesses and himself prepare and have ready for submission what he deems to be an adequate apportionment plan. Surely, had a satisfactory substitute for Chapter 1, held unconstitutional by the District Court, been prepared and ready the court would have ordered the 1970 elections held under that plan rather than the invalid legislative scheme. And surely if appellant has ready for court use on November 1, 1971, a suitable alternative for an unacceptable legislative effort, or at least makes sure that the essential information is on hand, there is no justifiable ground for thinking the District Court could not, prior to June 1, 1972, complete its hearings and consideration of a new apportionment statute and, if that is rejected, adopt a plan of its own for use in the 1972 elections. Nor do we read the District Court decree as forbidding appellant from petitioning for reopening of the case prior to November 1, 1971, and presenting to the District Court the problem which it has now raised here but which we prefer at this juncture to leave in the hands of the District Court.[7]
The judgment is affirmed.

*It is so ordered.*

---

[7] Appellant has contended here that the use of voter registration figures, rather than actual population, to determine district size operates to the detriment of the poor, blacks, Mexican-Americans, and American Indians. In light of our disposition of this case, we need only advert to our admonition in *Burns* v. *Richardson, supra,*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, concurring.

The complaint in this case was filed on April 27, 1964. The District Court stayed all proceedings on June 25, 1964, until after the next regular session of the legislature and, when nothing was achieved, stayed them again until after a special session. A reapportionment plan produced by that legislature was held unconstitutional. 250 F. Supp. 537.

Thereupon the District Court drew a "temporary and provisional" plan for the general elections of 1966 and 1968. See 254 F. Supp. 997; 289 F. Supp. 827; 303 F. Supp. 224. In 1967 the legislature produced another plan which was approved by the voters and became effective January 17, 1969. This plan was also declared unconstitutional by the District Court on July 22, 1969. The legislature then adopted a new plan effective January 22, 1970. The District Court allowed this plan to be used for the 1970 general election, although it considered the plan to be unconstitutional. The District Court in its decree provided:

> "The court, having been advised that detailed population figures for the State of Arizona will be available from the official 1970 census by the summer of 1971, assumes that the Arizona Legislature will by November 1, 1971, enact a valid plan of reapportionment for both houses of the Arizona Legislature and a valid plan of redistricting the con-

that use of voter registration as a basis may "perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process," 384 U. S., at 92, and is allowable only if it produces "a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis." *Id.*, at 93. We presume, of course, that any plan submitted, and certainly any plan approved by the District Court, will be faithful to this requirement.

gressional districts of Arizona. Upon failure of the Legislature so to do, any party to this action may apply to the court for appropriate relief."

The District Court also retained jurisdiction of the cause. 313 F. Supp. 148.

Since *Reynolds* v. *Sims*, 377 U. S. 533, Arizona has not had a constitutionally valid apportionment plan. Members of the Arizona Legislature who were elected in the 1970 election were elected under a plan the District Court held unconstitutional. Under that plan a computer was instructed to redistrict the State and to accomplish, in order, the following objectives: (1) to make the districts as equal in population as possible; (2) to circumscribe the districts in such a way that each included one incumbent senator and two incumbent representatives; (3) to make the districts compact; and (4) to make districts politically homogeneous.

Even assuming the legislative districts were of equal population the plan would have several practical deficiencies as far as minority representation goes. The 1970 plan insured that no incumbent would be running against another incumbent, as often may happen under a reapportionment plan. Thus the opportunity for preserving the status quo was assisted.

An effort to make each district politically homogeneous compounded this problem. The record provides a new definition of gerrymandering. A gerrymandered district in Arizona is not one where a "natural" majority finds its power erased by either moving lines to increase the numbers of the opposition in the district or by moving the lines so that a majority is dispersed. In Arizona a gerrymandered district came to be one that is overwhelmingly either Republican or Democratic. Thus when the second and fourth factors are combined an incumbent had not only the natural benefits of incum-

bency, but also the benefits (where possible) of a one-party district, his own fiefdom.

The record reveals that the 1970 plan heavily favored incumbents even if we assumed equal population districts. Such an assumption, of course, is contrary to the facts; deviations in Arizona ranged from about 24% above the median to about 52% below the median.

The basic unit for a district was the local political precinct. Unfortunately, there were no population figures for the basic unit, thus making it difficult to build the districts. Such figures were created by programming the computer to assume that a precinct population was that part of the 1960 county population which the number of registered voters in the precinct in 1968 bore to the number of registered voters in the county in 1968.

If all segments of society were equally likely to register to vote, then the Arizona method of computing population would be unobjectionable. But all members of a community are not equally likely to register. For example, only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the statewide average.[1] Not only are the poor, the blacks, the Chicanos, and the Indians less likely to register in the first place, they are also likely to have a higher rate of illiteracy among their members. Arizona law at the time of the decision below required a literacy test for voter registration. Ariz. Rev. Stat. Ann. §§ 16–101 (A)(4), 16–101 (A)(5). Naturally this compounded the problem of underregistration of minority groups.[2]

---

[1] Hearings on S. 818, S. 2456, S. 2507, and Title IV of S. 2029 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st and 2d Sess., 406 (1969–1970).

[2] Because of the Voting Rights Act Amendments of 1970, literacy tests will not be a factor in future elections. Section 201, 84 Stat. 315, bars a State from denying the right to vote in any federal,

While the present record lacks some basic statistics, we do know that in 1965 the Bureau of the Census determined that less than 50% of the residents of voting age were registered or voted in the 1964 presidential election in Apache County, Navajo County, and Coconino County. 30 Fed. Reg. 9897, 14505. Under § 4 (a) of the Voting Rights Act of 1965, 79 Stat. 438, the application of the literacy tests was suspended by the publication of the statistics in the Federal Register, but the suspension was lifted a year later on the showing that the literacy tests had not been used in a discriminatory manner. *Apache County* v. *United States,* 256 F. Supp. 903. As of last fall Yuma County was subject to the literacy test ban of the Voting Rights Act of 1965. See *Oregon* v. *Mitchell,* 400 U. S. 112, 131 n. 12.

The 1970 plan adversely affected minorities. Because of the registration statistics used, one district in the Phoenix ghetto had approximately 70,000 residents while an affluent all-white district in another area of Phoenix had only 27,000 residents. The Indian reservation area in northeastern Arizona fared little better. While it had sufficient numbers of Indians to justify a separate district which could undoubtedly elect Indian representatives in the state legislature, the Indians were done in. At the time of this suit there were no Indians elected to either the State House or Senate. But just to the south of the area two state senators lived 10 miles apart. Hence, the incumbency rule was invoked to split the Indian area so as to accommodate the two white senators.

The Arizona Legislature has yet to develop a reapportionment plan which can pass constitutional muster. The incumbents who now have the opportunity to draft

state, or local election because of "any test or device" which is defined, *inter alia,* to include literacy. This part of the Act was upheld in *Oregon* v. *Mitchell,* 400 U. S. 112.

the plan come from districts which are malapportioned and overrepresent the white vote. A valid apportionment plan will seemingly mean the defeat of several incumbents. The new efforts to gerrymander the State for the members of the current legislature will doubtless be prodigious. Members of the 1970 legislature had the twin advantages of running as single incumbents and in politically homogeneous districts. Members of minority groups had the disadvantage of underrepresentation. That invidious discrimination still exists.

On oral argument it was said that there is no point in initiating the design of a reapportionment plan now because the 1970 census figures are not available. That argument is difficult to comprehend, for it appears [3] that in March 1971 New Jersey completed a comprehensive reapportionment plan based on the 1970 census. The District Court has shown great patience and has been persevering. It probably is the first to realize that the Gordian knot must be cut if there is to be a plan that satisfies constitutional requirements.

It has indicated it will wait until November 1, 1971, before it initiates a constitutional plan. The hearings on such a plan will doubtless be long drawn out and extensive. The prize is great, for if the present incumbents can prolong matters, the 1972 election may come and go with the existing invalid 1970 plan in effect. It is not difficult to imagine how easy that strategy might be. The 1972 primaries in Arizona are in September.[4]

Primaries apart, there is always the problem of review by this Court. We are plagued with election cases coming here on the eve of elections, with the remaining

---

[3] N. Y. Times, March 24, 1971, p. 47.

[4] The primary election in Arizona in 1972 will be held on Sept. 13. See Ariz. Rev. Stat. Ann. § 16–702.

time so short we do not have the days needed for oral argument and for reflection on the serious problems that are usually presented. If an election case is filed in our summer recess, we will not consider it until the first week in October; and our effort to note the appeal, hear the case, and decide it before November without disrupting the state election machinery is virtually impossible. The time needed is lacking.[5]

---

[5] *Williams* v. *Rhodes,* 393 U. S. 23, was an exceptional case. There MR. JUSTICE STEWART acting as Circuit Justice and in consultation with available members of this Court granted injunctive relief ordering the election ballots printed in such a way as to include the American Independent Party, the losing party in the District Court. This was to insure that, if it prevailed here, relief would be available. 21 L. Ed. 2d 69, 89 S. Ct. 1. An expedited briefing schedule was authorized and we heard oral argument as soon as the Term commenced. Eight days later our opinion was handed down modifying the judgment of the District Court. Had not MR. JUSTICE STEWART granted the injunction in September the appellants' victory would have been a hollow one.

A challenge to Colorado's durational residency requirement prior to the 1968 election did not fare as well. The District Court upheld the requirement and we heard oral argument after the election was over. The case was dismissed as moot. *Hall* v. *Beals,* 396 U. S. 45.

Durational residency requirements have come before the Court several times this Term. In *Hayes* v. *Lieutenant Governor of Hawaii,* there was a challenge to the Hawaii durational residency requirement for candidates. The Hawaii Supreme Court upheld the law in late August. An application for an injunction was denied. When the appeal finally came up for consideration on the merits, again after the election, it was dismissed as moot, 401 U. S. 968. In *Sirak* v. *Brown* a state durational residency requirement for voters was upheld and, when this Court denied an injunction, 400 U. S. 809, the plaintiff chose not to docket his appeal, probably on the basis of *Hall* v. *Beals, supra.* A similar issue was present in *Fitzpatrick* v. *Board of Election Comm'rs of Chicago,* where we denied a motion to expedite the appeal, 401 U. S. 905. Had all the lower courts followed *Drueding* v. *Devlin,* 234 F. Supp. 721 (Md. 1964), aff'd, 380 U. S. 125, then mootness might have prevented any plenary review of the issue. But several district courts have con-

If a case is to be heard and decided on these important issues it must be here by February so that we can work it into our spring calendar of argued cases and decide it before July. If the District Court waits until November to hold hearings and put a reapportionment plan in operation, it is unlikely that any such schedule can be met.

It is, therefore, essential that the judicial machinery be put into motion soon, so that a resolution of a matter

cluded that subsequent decisions have undermined *Drueding* and thus have invalidated durational residency requirements. This avoids the mootness issue and we have noted probable jurisdiction in one such case, *Ellington* v. *Blumstein,* 401 U. S. 934.

In *Beller* v. *Kirk* there was a challenge to the Florida requirement demanding an independent candidate obtain 5% of the registered voters to sign a petition so that he could get on the ballot. Injunctive relief was denied by individual Justices early in October, but the case has subsequently been docketed *sub nom. Beller* v. *Askew,* No. 1360. We have heard oral argument on the same issue in *Jenness* v. *Fortson,* No. 5714.

The Ohio laws are involved in several cases pending this Term. In one, the District Court handed down its decision late in July 1970. By that decision several sections of the Ohio laws were invalidated and we noted probable jurisdiction. *Gilligan* v. *Sweetenham,* 401 U. S. 991. A loyalty oath was upheld and we noted probable jurisdiction in that case. *Socialist Labor Party* v. *Gilligan,* 401 U. S. 991. The court also upheld a provision requiring independent candidates to file at the same time as major party candidates. *Sweetenham* v. *Gilligan,* No. 790. A similar issue is also presented in *Pratt* v. *Begley,* No. 1044, where the District Court for the Eastern District of Kentucky made its ruling in early October.

The then-forthcoming Chicago election in April 1971 also presented cases where one of the parties needed immediate action. In *Jackson* v. *Ogilvie,* the issue was the requirement that an independent obtain 5% of the registered voters on a nominating petition. We denied a stay on February 22, 1971, 401 U. S. 904, and there was no way the case could be heard prior to the election.

Through all these cases *Williams* v. *Rhodes* stands out as exceptional, because both the necessary preargument injunctive relief and expedited oral argument were obtained.

that has defied solution for seven years be no longer delayed. I write these words not in criticism of the District Court but in support of its steadfast efforts to bring this stubborn litigation to an early end.

MR. JUSTICE HARLAN concurs in the result upon the premises set forth in his separate opinions in *Whitcomb* v. *Chavis, post,* p. 165; *Oregon* v. *Mitchell,* 400 U. S. 112, 152 (1970); and *Reynolds* v. *Sims,* 377 U. S. 533, 589 (1964).